
IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 21, 2021 Session

**IN RE KAYLENE J., ET AL.**

**Appeal from the Juvenile Court for Rhea County**
**No. 17-JV-18          J. Shannon Garrison, Judge**
_____

**No. E2019-02122-COA-R3-PT**
_____

This case involves a petition to terminate a mother's parental rights to her minor children. The petition was filed by the Tennessee Department of Children's Services. The trial court granted the petition, finding multiple grounds for termination were established and that it was in the best interest of the children to terminate the mother's parental rights. The mother appealed. We affirm the trial court's decision in part, vacate in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Vacated in Part; and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Joshua E. Hixson, Dayton, Tennessee, for the appellant, Katina R.[1]

Herbert H. Slatery, III, Attorney General and Reporter; and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.     FACTS AND PROCEDURAL HISTORY**

Katina R. ("Mother") is the biological mother of Kourteney J., born in 2001; Kaylene J., born in 2002; Kassiah R., born in 2005; and Jasonna R., born in 2008. This action involves a petition to terminate Mother's parental rights to the children. Prior to

---

[1] In cases involving minors, this Court has a policy of protecting the identity of children by initializing the last names of the parties. *See In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

trial, Kourteney reached the age of majority. Accordingly, Mother's parental rights to Kourteney were not a subject of the trial court's final order. Additionally, the putative fathers of the children have not participated in any part of this case and do not take part in this appeal. Therefore, the scope of this appeal is limited to Mother's parental rights to Kaylene, Kassiah, and Jasonna.

On March 8, 2017, the Tennessee Department of Children's Services ("DCS") received a referral involving the children. The referral alleged that the children were left alone in Mother's apartment without adult supervision for an extended period of time. Later that day, law enforcement and child protective services investigated the referral. Upon their arrival at Mother's apartment, Kourteney (who was a minor at the time) informed them that Mother had been in Georgia for the past several days. The children stated that neighbors were "keeping an eye on them" while Mother was gone. When the investigators spoke with several neighbors, all of the neighbors stated that they were not supervising the children. Thereafter, child protective services was unable to locate a family member that could take temporary custody of the children. As a result, on March 9, 2017, the children entered DCS custody and DCS filed a petition to declare the children dependent and neglected. The next day, the trial court entered an *ex parte* protective custody order that granted temporary legal custody of the children to DCS, effective as of March 9, 2017.

Initially, all of the children were placed with the same pre-adoptive foster family. Later, Kourteney was relocated to another foster home. Kassiah requested to join Kourteney at this new home and was relocated to join Kourteney. Although Kourteney has since reached adulthood, Kassiah remains placed in this home. Since trial, Kaylene has also reached adulthood, but Jasonna continues to reside with her original pre-adoptive foster family.[2]

An adjudicatory hearing on the dependency and neglect petition was held on April 26, 2017. At the hearing, the court found by clear and convincing evidence that the children were dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(13). On May 30, 2017, the court entered a written order that adjudicated the children dependent and neglected.

Prior to the adjudicatory hearing, on April 5, 2017, LeAnn Smith (the DCS Family Service Worker initially assigned to the children's case) ("FSW Smith") held a child and family team meeting. Mother did not attend the meeting in person but participated via telephone. At the meeting, the parties prepared and outlined a Family Permanency Plan. On May 1, 2017, Mother and FSW Smith finalized a plan that outlined several

---

[2] Although Kaylene has reached adulthood, because Mother's parental rights to Kaylene were terminated, we shall review termination of those rights in this appeal. *See In re Jeremy C.*, No. M2020-00803-COA-R3-PT, 2021 WL 754604, at *6 n.5 (Tenn. Ct. App. Feb. 26, 2021).

requirements for Mother to complete. Under the plan, Mother was required to: (1) maintain legal and verifiable employment and provide proof of such to DCS; (2) attend the children's educational meetings and medical appointments; (3) consistently visit the children; (4) maintain and reside in housing for at least six months and provide proof of such housing to DCS; (5) maintain contact with DCS and notify it of any changes of circumstances including employment, address, and contact information; (6) not incur any additional criminal charges; (7) obtain counseling for her parenting and domestic violence concerns; and (8) provide a transportation plan to DCS, including proof of insurance and registration. Mother agreed to the requirements of the plan. On June 8, 2017, the trial court ratified the plan, finding that Mother's requirements were reasonably related to the goal of returning the children to Mother.

Despite her acknowledgement of her responsibilities under the permanency plan, Mother continued to live a disruptive and chaotic lifestyle. FSW Smith arranged several visits between Mother and the children, but Mother was continuously combative and aggressive towards FSW Smith. It was difficult for FSW Smith to arrange visits because Mother would refuse to respond to her calls, would travel out of the state, and would refuse to give her important information such as her address or location. Mother frequently asked for the visits to be rescheduled or relocated at the last minute. At times, FSW Smith was able to grant Mother's requests and would change the location or time for a visit. However, even when FSW Smith would accommodate Mother, Mother would remain frustrated and hostile. There were multiple instances that resulted in Mother canceling visits despite FSW Smith agreeing to reschedule or relocate. On one occasion, after FSW Smith granted Mother's requests, Mother canceled the visit and stated "that she has a life and things to do." On other occasions FSW Smith was forced to cancel several visits due to Mother's confrontational demeanor.

When Mother did visit with the children, the interactions were overwhelmingly negative, combative, and detrimental to the children. At times, Mother would criticize the children's appearance or would instruct them to be uncooperative with their foster parents. In September 2017, Mother's combative nature at visits reached a boiling point. On September 29, 2017, a scheduled visit took place at Mother's residence. FSW Smith transported the children to the visit, but the visit was supervised by a therapeutic visitation worker. Shortly after the visit began, Mother began yelling about her frustrations with DCS and telling the children that DCS was the reason that they were not together. Towards the end of the visit, FSW Smith—who waited outside of Mother's home during the visit—instructed Kourteney to inform the other children that the visit was ending. When Kourteney returned inside Mother's home, Mother refused to release the children to FSW Smith. Eventually, FSW Smith called law enforcement due to Mother's actions. When law enforcement arrived, the children were released to FSW Smith.

FSW Smith also arranged for video and telephone visits between Mother and the children. Similar to the in-person visits, these visits were often unproductive. Whether

- 3 -

over video or on a telephone call, Mother continued to criticize and manipulate the children. At the end of the visits, the children were often upset by Mother's statements. The last in-person visit between Mother and the children took place in July 2018.

Along with the visitations being unsuccessful, Mother continued to live a transient lifestyle after the children entered DCS custody. When DCS received the initial referral in March 2017, Mother's residence was in Spring City, Tennessee. In approximately May 2017, Mother obtained a new residence in McMinnville, Tennessee. From November 2017 to March 2018, Mother resided at several different residences in Florida. She reported approximately six different addresses during this time, including multiple domestic violence and homeless shelters. In March 2018, Mother informed DCS that she had returned to her McMinnville, Tennessee residence. In December 2018, she reported that she retained her home in McMinnville but was residing in Murfreesboro, Tennessee; however, she did not disclose an exact address. Around the same time, Mother informed another DCS worker[3] that she was residing in Georgia, not Murfreesboro. At a review hearing on February 28, 2019, Mother informed the trial court that she was staying in Murfreesboro but retained her home in McMinnville. Once again, she did not disclose an exact address. In part due to her transient lifestyle, the last in-person visit that Mother attended took place in July 2018. After Mother failed to attend a scheduled visit in August 2018, she told three of the children that she did not attend because she was not informed about the visit. In actuality, Mother helped schedule the visit and simply refused to attend.

Throughout the time the children were in DCS custody, Mother reported that she had unreliable transportation. She claimed that she was unable to make several visits and meetings with DCS due to her transportation issues. However, from March through May 2019, Mother made several Facebook posts that indicated she was traveling to destinations such as Las Vegas and Jamaica.

Similar to visitations with the children, Mother's transient lifestyle and hostile attitude towards DCS made her interactions with DCS increasingly difficult. Mother was particularly hostile at a child and family team meeting with DCS in October 2017. The meeting ended quickly after Mother began screaming and yelling at several DCS employees. At one point, Mother even referred to FSW Smith as "the devil."

Mother's hostility towards DCS also prevented her from successfully completing her responsibilities in the permanency plan. Again, the trial court ratified an initial Family Permanency Plan on June 8, 2017. On November 7, 2018, the trial court ratified a renewed plan that contained the same requirements as the initial plan. Since the children entered DCS custody, DCS had made several attempts to assist Mother in completing her permanency plan requirements. Despite its efforts, time and again, Mother either denied

---

[3] Along with the four children involved in this case, Mother has two other minor children that entered DCS custody in a separate proceeding in September 2018.

- 4 -

the help or failed to follow through on completing important tasks. At one point, Mother did provide proof that her driver's license was reinstated, that she completed a psychological assessment, and that she had obtained housing. However, her license was revoked shortly thereafter, she failed to complete the requested parenting portion of the psychological assessment, and she continued to frequently change residences.

Mother failed to complete the vast majority of her permanency plan requirements. She never provided DCS with proof of employment; she did not attend the children's educational meetings or medical appointments; she did not maintain consistent contact with DCS; she did not provide proof of attending any counseling sessions; and she did not consistently visit the children. In contrast, she affirmatively violated many of the permanency plan requirements. Mother incurred several new criminal charges in September and October 2018. On September 2, 2018, Mother was arrested for disorderly conduct, criminal trespass, and evading arrest. The disorderly conduct and criminal trespass charges were subsequently dismissed, but Mother was found guilty of evading arrest. Mother was incarcerated from September 2 to September 25, 2018, for these charges. Shortly after being released from incarceration, on October 4, 2018, Mother was arrested for driving under the influence. Mother pled no contest to the DUI charge and was released from jail on October 11, 2018.

On January 9, 2019, after the children had been in DCS custody for nearly two years, DCS filed a petition to terminate Mother's parental rights. The petition listed several potential grounds for termination, including abandonment by failure to provide a suitable home, abandonment by failure to provide support, abandonment by an incarcerated parent, abandonment by exhibiting a wanton disregard for the children's welfare, persistence of conditions, substantial noncompliance with the Family Permanency Plans, and failure to manifest an ability and willingness to parent. In response to the petition, in Mother's answer, she claimed that DCS failed to provide adequate support and that the petition included several fabricated claims.

The trial court held a review hearing on February 28, 2019. Previously, Mother was provided court-appointed counsel. After Mother accused the court-appointed counsel of conspiring with DCS, on January 25, 2019, Mother's appointed counsel was allowed to withdraw from representation. The trial court permitted Mother to have until the review hearing to obtain new counsel. At the review hearing, Mother declined court-appointed counsel and stated that she would retain private counsel for the termination proceedings. However, there is no indication that Mother retained counsel for the remainder of the trial court proceedings. Trial on the termination petition was scheduled for June 12, 2019.

On June 12, 2019, Mother did not appear for trial. Deb Osborne, the court appointed special advocate assigned to the case, informed the court that she received a text message earlier that morning from Mother regarding her absence. Ms. Osborne stated that Mother claimed, in her text, that she was hospitalized and unable to attend. Mother sent Ms.

Osborne a picture of her hospital wristband as proof that she was actually receiving medical treatment. As a result of Mother's absence, the trial court continued trial to August 28, 2019. The certificate of service for the court's continuance order indicates that a copy of the order was sent to Mother's residence in McMinnville.

On August 28, 2019, Mother again failed to appear for trial. At the outset of the proceedings, Ms. Osborne testified that Mother texted her early that morning, stating that she was once again hospitalized and unable to attend. Ms. Osborne stated that she received the message from an unknown number. She responded by attempting to contact both the unknown number and Mother's cell phone number. Ms. Osborne sent texts messages to both numbers, asking for verification that Mother was hospitalized. Despite her efforts, Ms. Osborne did not receive a response. In open court, Ms. Osborne called Mother's phone and the unknown number, but both calls went unanswered. Based on Mother's lack of response and failure to provide proof that she was hospitalized, the trial court proceeded with trial.

Two witnesses testified at the first day of trial on August 28, 2019: FSW Smith and Kristin Jennings ("FSW Jennings"). In June 2018, FSW Jennings had replaced FSW Smith as the family service worker assigned to the case.

FSW Smith testified on the children entering DCS custody, the creation of the permanency plans, Mother's requirements under the plans, Mother's visitations with the children, and DCS's involvement in the case. FSW Smith testified at length on Mother's history of hostility towards DCS. She stated that Mother was not receptive to any of the services or assistance offered by FSW Smith. Initially, FSW Smith supervised Mother's visits with the children. However, she testified that because Mother continued to act in a hostile and aggressive manner, FSW Smith arranged for a therapeutic visitation worker to supervise the visits. FSW Smith further testified that despite the change in supervision, the visits continued to be unproductive.[4]

FSW Smith also testified on the assistance that she provided Mother to help her complete her permanency plan requirements. She testified that she provided Mother with a gas card to help with transportation issues. FSW Smith also provided information for Mother to complete counseling and parenting classes. She also arranged for Mother to obtain in-home services such as therapeutic visitations and domestic violence and parenting curriculums, which would have been paid for by DCS.[5] FSW Smith also contacted TennCare on Mother's behalf to help arrange insurance coverage and requested a parenting

---

[4] FSW Smith testified at length on the assistance DCS attempted to provide Mother and Mother's reluctance to accept the assistance. The trial court explicitly credited FSW Smith's testimony on these issues.

[5] FSW Smith stated Mother was asked to participate in domestic violence counseling after Mother was involved in a domestic violence incident in her home. She stated that the incident occurred in the presence of Mother's two youngest children, who are not a part of this case.

assessment that included a psychological component. FSW Smith stated that she provided Mother assistance within the first four months of the children entering DCS custody.

Despite the support provided by FSW Smith, Mother continued to be unreceptive and hostile towards DCS. FSW Smith testified that Mother did not follow up on receiving assistance or counseling. Additionally, she stated that Mother could have received multiple gas cards, but Mother failed to provide receipts to indicate that she used the previously provided cards. Further, although FSW Smith arranged for therapeutic visitations in Mother's home, Mother continued to exhibit disruptive and inappropriate behavior at visits.

FSW Jennings also testified on August 28, 2019. Similar to FSW Smith's experience, FSW Jennings stated that Mother was hostile and unreceptive during the time that she was assigned to the case. She stated that Mother frequently failed to respond to her communications; refused to take important materials related to the case, including the criteria for termination of Mother's parental rights; and failed to keep DCS informed of her current address.

FSW Jennings also testified on Mother's interactions with the children and the children's progress since entering DCS custody. In August 2018, FSW Jennings attempted to arrange a visit between Mother and the children. Mother requested to visit with all of the children at the same time, which would require the children to miss school. When FSW Jennings explained this, Mother stated that she did not care if the children missed school for a visit. When visitations did occur, FSW Jennings stated that Mother criticized "everything" about the children. FSW Jennings further testified that, despite the tumultuous nature of this case, the children were doing well in foster care. Kourteney had "aged out" of foster care at the time of trial, but Kassiah continued to reside in a long-term foster home while DCS sought to find a pre-adoptive home. Kaylene and Jasonna continued to reside in their original pre-adoptive foster home. Prior to trial, Kaylene and Jasonna both indicated that they wanted to be adopted by their foster family.

At the close of FSW Jennings's testimony, the trial court continued the remainder of trial to September 25, 2019. The continuance order that set the remainder of trial for September 25, 2019, indicates that the order was mailed to Mother's McMinnville residence.

Although the initial continuance order was mailed to Mother's McMinnville address, Mother failed to appear for the second day of trial on September 25, 2019. FSW Jennings testified that she attempted to contact Mother after the previous hearing to inform her of the continuance, but Mother failed to respond to her phone calls and text messages. Ms. Osborne testified that she also tried to contact Mother after the previous hearing, but she did not receive a response. With no response from Mother, the trial court proceeded with trial.

Two additional witnesses testified on September 25, 2019, Shannon Jones (another DCS family service worker) ("FSW Jones") and Kaylene and Jasonna's foster mother.

FSW Jones was the family service worker for Mother's two youngest children who are not a part of this case. Mother's youngest children entered DCS custody in September 2018 after Mother was arrested for disorderly conduct, criminal trespass, and evading arrest. The initial referral to DCS regarding these children alleged nutritional neglect. A subsequent investigation also revealed that the youngest children witnessed multiple instances of domestic violence. Similar to FSW Smith and FSW Jennings's experience, FSW Jones testified that Mother's participation in the case had been extremely limited. He stated that Mother's phone calls with the youngest children were frequently negative. During phone calls, Mother would "interrogate" the children and would attempt to have the children lie about the children's foster parents.

FSW Jones further testified that the two youngest children underwent weekly counseling while in DCS custody. He stated that during counseling and a forensic interview, the children disclosed that Mother and her paramours often engaged in "sexual games" with those children. FSW Jones testified that the children described inappropriate touching by Mother and the paramours against the children, causing the children lasting trauma. As a result of the youngest children's disclosures, FSW Jones stated that the Warren County Juvenile Court found that Mother committed severe abuse against them. Counsel for DCS moved to submit a copy of the Warren County court's order that contained the abuse finding as a late-filed exhibit when it became available. The trial court granted DCS's motion and identified the future exhibit as "Exhibit no. 14," but the exhibit was never filed as a part of this record.

Kaylene and Jasonna's foster mother was the last witness to testify. The foster mother indicated that she and her husband have bonded with the children and consider them to be a part of their family. She stated Kaylene and Jasonna have thrived since they entered their custody. She elaborated that both girls are earning high grades in school and are undergoing therapy. A letter from Kaylene and Jasonna's therapist confirmed that the girls are doing well with the foster parents and would benefit by remaining in their custody. Both the foster mother and the therapist (through her letter) indicated that Kaylene and Jasonna have expressed a desire to be adopted by the foster parents. The foster mother confirmed that she and her husband wish to adopt Kaylene and Jasonna if they become available for adoption. She also stated that she will continue to allow the girls to remain in contact with their other siblings.

The trial court entered its final order on January 9, 2020.[6] Due to Mother's absence

---

[6] On November 6, 2019, the trial court entered an initial order that terminated Mother's parental rights. On December 4, 2019, DCS moved the court to alter or amend its order, requesting that the court make additional findings on its ruling. The trial court granted this motion and subsequently entered its final

at both days of trial, the trial court relied solely on the unrefuted testimony that was presented by DCS. Based on the undisputed testimony, the trial court found that there was clear and convincing evidence to establish each ground for termination that was asserted by DCS. The court specifically found that DCS made reasonable efforts to assist Mother after the children entered DCS custody, that Mother's failure to make minimal efforts demonstrated a lack of concern for the children, that Mother continues to exhibit an unstable lifestyle, and that Mother lacks parenting skills and an ability to care for the children. In relation to the family permanency plans, the court concluded that Mother "has completed virtually none of the steps" in the plans despite the assistance offered by DCS. After considering Mother's volatile nature, continued instability, inconsistent visitations, and lack of meaningful relationships with the children, the court found that it was in the best interest of the children to terminate Mother's parental rights. As a result, the court terminated Mother's parental rights to the children.

Mother timely appealed.[7]

## II. ISSUES PRESENTED

Although stated slightly differently by the parties, the issues on appeal can be summarized as the following:

1. Whether Mother was provided adequate notice of trial dates on the petition to terminate her parental rights;

2. Whether the trial court erred in considering testimony on allegations of abuse committed against children who are not a subject of this case;

3. Whether the trial court erred in finding there was clear and convincing evidence of grounds for the termination of Mother's parental rights; and

4. Whether the trial court erred in finding that it was in the best interest of the children to terminate Mother's parental rights.

For the reasons stated herein, we affirm the trial court's decision in part, vacate in part, and remand.

## III. STANDARDS IN TERMINATION CASES

order.

[7] Mother filed her notice of appeal before the trial court entered its final order on January 9, 2020. However, Mother's early filing does not disrupt her right to an appeal. *See* Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof.").

- 9 -

The Tennessee Supreme Court has previously described the critical nature of proceedings that involve the potential termination of parental rights:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. But parental rights, although fundamental and constitutionally protected, are not absolute. . . . When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. Few consequences of judicial action are so grave as the severance of natural family ties. The parental rights at stake are far more precious than any property right. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or guardian of the child. In light of the interests and consequences at stake, parents are constitutionally entitled to fundamentally fair procedures in termination proceedings.

*In re Carrington H.*, 483 S.W.3d 507, 521-22 (Tenn. 2016) (footnote omitted) (citations omitted) (quotation marks omitted).

One protection afforded to parents in termination actions is that the petitioner must prove the elements by clear and convincing evidence. *Id.* at 522; *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). This heightened standard of proof "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights." *In re Carrington H.*, 483 S.W.3d at 522. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citation omitted). It also "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). Accordingly, a party seeking to terminate a parent's parental rights must prove two elements by clear and convincing evidence. *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). First, the petitioner must prove a least one of the statutory grounds for termination. *See* Tenn. Code Ann. § 36-1-113(g); *In re Kaliyah S.*, 455 S.W.3d at 552. Second, the petitioner must prove that termination of the parent's parental rights is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(i); *In re Kaliyah S.*, 455 S.W.3d at 552.

Recently, in regard to this Court's role in cases involving the termination of parental rights, our Supreme Court has explained:

Rule 13(d) of the Tennessee Rules of Appellate Procedure supplies the standard that governs an appellate court's review of a trial court's

determination in a parental termination proceeding. Under Rule 13(d), appellate courts review factual findings de novo with a presumption of correctness, unless the evidence preponderates otherwise. A trial court's determination as to whether facts amount to clear and convincing evidence supporting termination of parental rights is a conclusion of law. As such, an appellate court reviews this determination de novo, affords no deference to the trial court's decision, and makes its own determination about whether the facts amount to clear and convincing evidence of the elements necessary to terminate parental rights. The issue of statutory construction presented in this appeal also is a question of law, which we review de novo with no presumption of correctness.

*In re Neveah M.*, 614 S.W.3d 659, 673-74 (Tenn. 2020) (citations omitted).

## IV. DISCUSSION

### A. Due Process – Notice

Trial on the petition to terminate Mother's parental rights was originally scheduled to begin on June 12, 2019. After Mother did not attend trial on June 12, claiming that she was hospitalized, the trial court entered an order that continued trial to August 28, 2019. Mother continued to be absent from trial on August 28, sending another message stating that she was hospitalized. However, she failed to provide sufficient proof to indicate that she was unable to attend trial, so trial began on August 28, 2019. DCS was unable to conclude its proof on August 28, so the trial court entered another order that continued the remainder of trial to September 25, 2019. The certificate of service on both continuance orders indicate that copies of the orders were mailed to Mother's residence in McMinnville, Tennessee.

Mother argues that she did not receive sufficient notice of the new trial dates and, as a result, she was not afforded sufficient due process to defend against the petition to terminate her parental rights. She argues that DCS failed to comply with Rules 5.01 and 5.02 of the Tennessee Rules of Civil Procedure by mailing copies of the continuance orders to her address in McMinnville.

"[A]ll parties to litigation are entitled to receive notice of important hearings and other proceedings; due process requires it." *Bryant v. Edwards*, 707 S.W.2d 868, 870 (Tenn. 1986); *see also Keisling v. Keisling*, 92 S.W.3d 374, 377 (Tenn. 2002) (stating that "due process requires 'notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'"). Similarly, Rule 5.01 of the Tennessee Rules of Civil Procedure states that "every order required by its terms to be served; . . . every written motion other than one which may be heard ex parte; and, every written notice, appearance, demand, offer of

- 11 -

judgment, . . . and similar papers shall be served upon each of the parties." Additionally, Rule 5.02 states that service of a court's order may occur "by mailing it to such person's *last known address*." Tenn. R. Civ. P. 5.02(1) (emphasis added). A pro se litigant that "relocates during the course of litigation . . . is encumbered with the responsibility of notifying the clerk of the court of his new address." *Reynolds v. Battles*, 108 S.W.3d 249, 251 (Tenn. Ct. App. 2003).

Mother claims that she satisfied her obligation of informing the court of her new address by reporting at a review hearing on February 28, 2019, that she was staying in Murfreesboro. However, the trial court's order from the February 28 hearing indicates that Mother also stated that she retained her home in McMinnville. Further, there is no indication that Mother, as a pro se litigant, informed DCS or the trial court of a precise address in Murfreesboro. Still, she argues that informing the court that she resided in Murfreesboro generally was sufficient and that the court or DCS should have asked for her precise address. We disagree and fail to see how Mother satisfied her obligation to inform the court of the location of her new residence.

Again, it is the litigant's responsibility to notify the court of his or her new address. *See Reynolds*, 108 S.W.2d at 251. Simply stating that she lives in one municipality rather than another does not alleviate a litigant of this responsibility. Mother was obligated to disclose her address rather than making a broad stroke reference to a particular city. It was not the trial court's or DCS's responsibility to coax the current address from Mother. Without an address, DCS had no avenue for sending court filings to Mother's supposed new residence in Murfreesboro.

Because Mother did not disclose the address for her supposed new residence in Murfreesboro, her *last known residence* remained in McMinnville. Regardless, even if Mother occasionally resided in Murfreesboro, the record indicates that she maintained her residence in McMinnville. Accordingly, the certificates of service attached to the continuance orders that reset the trial dates for August 28, 2019, and September 25, 2019, indicate that DCS mailed copies of the orders to Mother's residence in McMinnville. Meaning, DCS complied with the notice requirements of Rules 5.01 and 5.02 by mailing the continuance orders to her *last known residence*. *See* Tenn. R. Civ. P. 5.01; 5.02(1); *Jenkins v. McClannahan*, No. M2010-02061-COA-R3-CV, 2012 WL 1070128, at *2 (Tenn. Ct. App. Mar. 28, 2012) (stating that because the party failed to fulfill his duty to notify the court of his change of address, his *last known address* was the appropriate address to mail notice of court proceedings). Therefore, we conclude that Mother is not entitled to relief under this issue.[8]

---

[8] We note that Mother does not take issue with the timeliness of the notices that reset the dates for trial. Additionally, we fail to see how Mother can claim that she did not receive notice of the first day of trial on August 28, 2019, when she sent a text message to Ms. Osborne that morning. Mother's text indicated that she could not attend because she was supposedly ill, not because she did not receive sufficient notice.

### B. Evidence Presented – "Exhibit no. 14"

Next, Mother asserts that the trial court improperly considered evidence that concerned allegations of abuse committed by Mother. Specifically, Mother takes issue with the testimony of FSW Jones on Mother's alleged abuse against her two youngest children and a court order in another case that purportedly found that Mother abused them. She claims that this evidence unfairly prejudiced the trial court's best interest analysis. We disagree.

The majority of FSW Jones's testimony on the allegations of abuse was a summary of the youngest children's reports. He stated that the youngest children reported playing "sexual games" with Mother and her paramours. He also testified that, based on the children's reports, on September 23, 2019, the Warren County Juvenile Court found that Mother committed severe child abuse. At the time of FSW Jones's testimony, a court order that contained this finding had not yet become available. As a result, the court allowed "Exhibit no. 14" to be filed at a later date, but it was never included in the record. In its final order of termination, the trial court primarily relied on FSW Jones's testimony that detailed the alleged abuse. In its discussion on the persistence of conditions ground, the trial court also noted that "a Warren County Juvenile Court Order found that [Mother] had severely abused two other children." This was exactly what FSW Jones stated during his testimony. There is nothing in the final order that indicates the trial judge relied solely on the missing exhibit rather than the testimony of FSW Jones about the findings contained in the exhibit. Despite "Exhibit no. 14" being absent from the record, we disagree that FSW Jones's testimony on Mother's alleged abuse was unfairly prejudicial. Additionally, any reliance the trial court may have placed on "Exhibit no. 14" was harmless, considering the testimony of FSW Jones.

Even assuming *arguendo* that the trial court erred in considering "Exhibit no. 14" since it was never entered into evidence as a late-filed exhibit, this potential error does not require reversal. The Tennessee Supreme Court has stated that "evidentiary error[s that are] neither structural nor constitutional [are] governed by Tennessee Rule of Appellate Procedure 36(b)." *State v. Jones*, 450 S.W.3d 866, 900 (Tenn. 2014). Tennessee Rule of Appellate Procedure 36(b) states that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Stated differently, a party "is not entitled to relief on appeal if the error [in admitting evidence] had no effect on the results of the trial." *State v. Adams*, 405 S.W.3d 641, 657 (Tenn. 2013). Instead, an "erroneous admission or exclusion of evidence is subject to harmless error analysis." *Ellis v. Modi*, No. M2019-01161-COA-R3-CV, 2020 WL 2316649, at *7 (Tenn. Ct. App. May 11, 2020) (citing *Goodwin v. Hanebis*, No. M2017-01689-COA-R3-CV, 2018 WL 4145889, at *4 (Tenn. Ct. App. Aug. 29, 2018)).

- 13 -

Mother's argument on this issue is analogous to this Court's discussion in *In re Ashton V.*, No. M2016-00842-COA-R3-JV, 2017 WL 1077056 (Tenn. Ct. App. Mar. 22, 2017), a case involving the modification of a primary residential parent designation. In *In re Ashton V.*, the trial court based its finding, in part, on a report from a Court Appointed Special Advocate. *Id.* at *6-7. However, the report was not admitted as an exhibit or made a part of the technical record. *Id.* at *7. On appeal, this Court concluded that because the report was not admitted into evidence, the trial court improperly relied on the report. *Id.* However, this Court also found that, even in the absence of the report, the evidence did not preponderate against the trial court's findings and, as a result, the trial court's improper reliance was harmless. *Id.*

Similar to our conclusion in *In re Ashton*, in this case, any reliance by the trial court on "Exhibit no. 14" was harmless. Taken as a whole, the reference to "Exhibit no. 14" did *not* improperly influence the trial court's analysis. In the absence of the court order as an exhibit, there was ample testimony regarding the abuse allegations from FSW Jones. Additionally, the trial court relied on the abuse allegations sparingly in its analysis. Under the persistence of conditions ground for termination, the trial court listed FSW Jones's testimony on the reported abuse. The trial court primarily relied on FSW Jones's testimony regarding the alleged abuse as one reason that indicates Mother's parenting issues will not be remedied at an early date. In conducting its best interest analysis, the trial court made extensive findings on the applicable best interest factors. *See* Tenn. Code Ann. § 36-1-113(i) (listing nine factors that a court must consider when determining whether terminating parental rights is in the best interest of the child). In its final order, the trial court's best interest analysis did not reference Mother's alleged abuse in the separate DCS case or FSW Jones's testimony.[9] Regardless, even in the absence of a trial exhibit that contained a finding of severe abuse by Mother, FSW Jones's testimony on the reported abuse would be directly relevant to a court's best interest analysis. *See* Tenn. Code Ann. § 36-1-113(i)(6).

For these reasons, we have determined that any reliance by the trial court on "Exhibit no. 14" was harmless and is not a sufficient basis to set aside the trial court's final judgment. *See* Tenn. R. App. P. 36(b).

### C. Grounds for Termination

In its final order, the trial court determined that DCS established seven separate grounds for termination of Mother's parental rights. On appeal, DCS concedes the grounds

---

[9] In its oral ruling on its best interest findings, the trial court did make references to FSW Jones's testimony. However, a transcript of the court's oral ruling was not incorporated into the final written order. *See Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015) ("It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders.").

of abandonment by failure to support and abandonment by failure to visit. Specifically, it concedes that the definition of "abandonment" under Tennessee Code Annotated section 36-1-102(1)(A)(i) cannot serve as a ground for termination because Mother was incarcerated within the four months preceding the filing of the termination petition. It also concedes that "abandonment for failure to support"[10] under section 36-1-102(1)(A)(iv) cannot serve as a ground for termination because the termination petition and the final order did not specify a particular four-month period under this ground. Because DCS has conceded these grounds for termination, we vacate the portions of the trial court's final order that terminate Mother's parental rights under these grounds.

Because we have vacated two of the grounds for termination that were found by the trial court, only five grounds remain at issue on appeal: (1) abandonment by failure to provide a suitable home; (2) abandonment by exhibiting a wanton disregard for the welfare of the children; (3) persistence of conditions; (4) substantial noncompliance with the Family Permanency Plans; and (5) failure to manifest an ability and willingness to parent. Although Mother's principal brief does not include a discussion on several of these grounds, we shall address each ground in turn. *See In re Carrington H.*, 483 S.W.3d at 525-26 (requiring appellate courts to "review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges [those] findings on appeal").

### 1. Abandonment by Failure to Provide a Suitable Home

Tennessee Code Annotated section 36-1-113(g)(1) states that a ground for termination of parental rights is established if a parent has abandoned the child under section 36-1-102. Under section 36-1-102, "abandonment" can occur, under certain circumstances, when a parent fails to obtain and sustain a suitable home for the child after the child is removed from the physical or legal custody of the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii). To terminate parental rights under this ground, the court must find "that a parent failed to provide a suitable home for [the] child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015) (citing Tenn. Code Ann. § 36-1-102(1)(A)(ii)). In order to assist the parent, DCS must make "reasonable efforts" by utilizing its superior resources to help the parent find a suitable home. *In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 5, 2020). Efforts made by DCS shall be "reasonable" if its "efforts equal or exceed the efforts of the parent" in finding a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). To establish abandonment by the parent's failure to provide a suitable home, DCS must make these "reasonable efforts" during a four-month period following the removal of the child. *Id.*; *In re Rahjada W.*, 2020 WL 2893434, at *5. Unlike other

---

[10] Although DCS's brief claims states that "abandonment for failure to visit" was improperly pled and found, the trial court's final order clearly indicates that it terminated Mother's parental rights under section 36-1-102(1)(A)(iv) for Mother's failure to provide adequate support.

- 15 -

definitions of abandonment, "the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to 'a period of four (4) months following the removal, the ground may be established." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (citation omitted) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)). Stated differently, "[section 36-1-102(1)(A)(ii)(c)] *does not* limit the court's inquiry to a period of four months *immediately* following the [child's] removal." *Id.*

In addition to adequate physical space, a suitable home includes a parent or guardian that gives adequate care and attention to the child. *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). A suitable home is "free of drugs and domestic violence." *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A parent fails to provide a suitable home if he or she lacks residential stability and lives nothing more than a transient lifestyle. *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *7 (Tenn. Ct. App. Jan. 16, 2020) (citing *In re Seth B.*, No. E2017-00173-COA-R3-PT, 2017 WL 4082484, at *9 (Tenn. Ct. App. Sept. 14, 2017)).

In the present case, the children were in Mother's custody at the time of removal. DCS made efforts to avoid removing the children from Mother's custody by attempting to locate a family member who could take temporary custody of the children, but its efforts were unsuccessful. Shortly thereafter, the children were adjudicated dependent and neglected. At the time of removal, the children were alone at Mother's residence in Tennessee. Since the children were removed from Mother's custody, Mother has lived in Tennessee, Georgia, and Florida. Along with retaining her own residence and staying with others, Mother has also resided at domestic violence and homeless shelters. Amidst Mother's continued instability, we agree with the trial court that DCS made numerous efforts throughout this case to help Mother find a suitable home.

FSW Smith testified that she provided Mother with a gas card and information to obtain counseling and parenting classes. FSW also arranged for Mother to obtain in-home services that would have been paid for by DCS. FSW Smith provided this assistance in the four months after the children were removed from Mother's custody. FSW Smith and FSW Jennings arranged several child and family team meetings. Mother participated in some of these meetings either in-person or by phone, but there were multiple meetings that were cancelled due to Mother's hostile conduct or because Mother failed to attend. The efforts made by DCS were made, in part, to help Mother obtain a home that would provide the children with adequate care and attention.

The efforts made by DCS clearly exceeded the efforts made by Mother. Rather than accept or act on the support offered by DCS, Mother continued to act hostile towards DCS

- 16 -

and failed to make minimal efforts to act on the support provided. Mother's decision to be uncooperative with DCS and to forgo counseling services is "directly related to the establishment and maintenance of a suitable home." *See In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009). Additionally, her continuously transient and unstable lifestyle exhibits a consistent failure to provide a suitable home for the children. *See In re Ronon G.*, 2020 WL 249220, at *7. Mother's inability or unwillingness to provide a suitable home for the children demonstrates such a lack of concern for the children "that it appears unlikely that [she] will be able to provide a suitable home for the child[ren] at an early date." *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c).

We find that DCS made reasonable efforts to help Mother establish a suitable home for the children and that its efforts exceeded those made by Mother. We affirm the trial court's finding that there is clear and convincing evidence to show that Mother has abandoned the children by failing to provide a suitable home under Tennessee Code Annotated sections 36-1-113(g)(1) and -102(1)(A)(ii).

### 2. Abandonment by Exhibiting a Wanton Disregard for the Welfare of the Children

Tennessee Code Annotated section 36-1-102(1)(A)(iv) provides another "mechanism[] by which abandonment may be proven." *See In re Navada N.*, 498 S.W.3d at 597. Section 36-1-102(1)(A)(iv) states that "abandonment" has occurred when:

> the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of [an action to declare a child abandoned], and . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2019).[11]

A parent engages in conduct that exhibits a wanton disregard for his or her child by "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences." *In re O.W.*, No. W2019-01127-COA-R3-PT, 2020 WL 97727, at *5 (Tenn. Ct. App. Jan. 9, 2020) (quoting *In re Chandler M.*, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *4 (Tenn. Ct. App. July 21, 2014)). In a parental termination case, the "consequences at issue" must "relate to the child's welfare." *In re Veronica T.*, No. M2017-00726-COA-R3-PT, 2018 WL 1410909, at *7 (Tenn. Ct. App. Mar. 21, 2018) (quoting *In re Chandler M.*, 2014 WL 3586499, at *4).

---

[11] The relevant portions of the Code are quoted as they appeared when DCS filed its petition in January 2019.

The relevant four-month period for determining whether Mother was incarcerated in this case under section 36-1-102(1)(A)(iv) spanned from September 9, 2018, to January 8, 2019. Mother was incarcerated on two separate occasions during this time period. From September 2 to September 25, 2018, Mother was incarcerated for criminal trespassing, disorderly conduct, and evading arrest. She was incarcerated again from October 4 to October 11, 2018, for driving under the influence. Conduct that can constitute a wanton disregard for the welfare of a child can include "criminal behavior, substance abuse, and the failure to provide adequate support or supervision." *In re Audrey S.*, 182 S.W.3d at 867-68. Even prior to Mother's first incarceration in September 2018, Mother's conduct exhibited a wanton disregard for the welfare of the children.

Throughout this case, Mother consistently exhibited behavior that did not act to better the welfare of the children. She missed or cancelled several visitations with the children. FSW Smith testified that during the 15 months she was assigned to the case, Mother visited the children only 15 times when she could have visited up to 63 times. When visits did occur, Mother was extremely hostile towards DCS and frequently criticized the children or would encourage them to act out towards their foster parents. Mother declined potential assistance by DCS and made statements such as "that she has a life and things to do" and that "she had a life and this [case] was not part of it." Further, Mother showed an indifference towards the children's success in school and failed to attend the children's educational meetings. As for Mother's ability to provide adequate support or supervision for the children, prior to her incarcerations, she lived a transient and chaotic lifestyle that resulted in her inability to provide a suitable home.

After considering the history of this case and Mother's pattern of hostility and instability, her conduct has clearly shown an indifference towards the children's welfare. Although she claims to be concerned for their wellbeing, her actions indicate otherwise. Her actions took place prior to her incarceration in September 2018. Therefore, we find that Mother has abandoned the children under Tennessee Code Annotated section 36-1-102(1)(A)(iv) by engaging in conduct that exhibited a wanton disregard for the children's welfare.

### 3. Persistence of Conditions

Codified under Tennessee Code Annotated section 36-1-113(g)(3)(A), "persistence of conditions" is another potential ground to terminate parental rights. This ground is present when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>> (i) The conditions that led to the child's removal still persist,

preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A).

A parent's inability to remedy conditions that led to a child's removal does not need to be willful to establish this ground. *In re Jaylah W.*, 486 S.W.3d 537, 556 (Tenn. Ct. App. 2015). The "persistent conditions" may include the original conditions that caused the child to be removed from the parent's custody or others that "in all reasonable probability would cause a child to be subjected to '*further* abuse and neglect.'" *In re Audrey S.*, 182 S.W.3d at 872 (citing Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)). When DCS's sustained efforts to "improve the parenting abilities . . . have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000).

In March 2017, the trial court entered an *ex parte* custody order that removed the children from Mother's custody, stating that there was probable cause to believe that the children were dependent and neglected. On May 30, 2017, the children were adjudicated dependent and neglected. The children were removed from Mother's custody due to her inability (or unwillingness) to provide adequate care and supervision. At the time of removal, Mother was constantly traveling to other states and continuously changing her residence. Since March 2017, Mother has reported living at a wide variety of residences, including one in McMinnville, Tennessee; approximately six different locations in Florida, which included multiple domestic violence and homeless shelters; and has recently alleged that she now resides in Murfreesboro, Tennessee. Mother's perpetual change of residences indicates that she continues to be unable to provide suitable care and supervision for the children.

In addition to Mother's continuous change of residences, there are "other conditions" that may not have led to the children's removal but "in all reasonable probability would cause [the children] to be subjected to '*further* abuse and neglect.'" *See In re Audrey S.*, 182 S.W.3d at 872 (quoting Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)). Such conditions include Mother's incessant hostility towards DCS, her failure to follow through on obtaining necessary counseling, her apathetic attitude towards the children's

- 19 -

physical health and educational success, her recent criminal issues, and multiple incidents of domestic violence. These "other conditions" are directly related to Mother's ability and desire to provide appropriate care and supervision for the children. The continuance of these conditions, along with those that contributed to the children entering DCS custody, are likely to subject the children to further neglect if they are to return to Mother's custody. These conditions have persisted and continued to manifest since March 2017. Meaning, Mother had over 29 months from the time the children entered DCS custody to the beginning of trial to remedy the conditions. Despite the lapse of time, the conditions persisted.

Considering the length of time that Mother had to remedy these conditions, we agree with the trial court in that Mother is unlikely to remedy these conditions at an early date. We further agree that the continuation of Mother's relationship with the children greatly diminishes the children's chances of being integrated into a safe and stable home. Kassiah continues to reside in a long-term foster home that provides her with adequate care and supervision. Similarly, as of trial, Kaylene and Jasonna were residing with their original foster family and had expressed a preference to be adopted.

Based on the foregoing discussion, we affirm the trial court's conclusion that "persistence of conditions" exists as a ground for termination under Tennessee Code Annotated section 36-1-113(g)(3).

### 4. Substantial Noncompliance with the Permanency Plans

In Tennessee, DCS is required "to prepare a permanency plan for each child in foster care under its supervision." *In re K.F.*, No. M2008-01742-COA-R3-PT, 2009 WL 1025829, at *6 (Tenn. Ct. App. Apr. 14, 2009). Permanency plans are developed to help ensure each foster child receives adequate care. *In re Jamel H.*, 2015 WL 4197220, at *7. Under Tennessee Code Annotated section 36-1-113(g)(2), one potential ground for termination of parental rights is present if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." To terminate a parent's parental rights under this ground, the parent's noncompliance with the plan must be *substantial* and the plan's requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002).

"Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Instead, DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not

- 20 -

been met." *Id.* (citing *In re Valentine*, 79 S.W.3d at 548-59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)). A parent's "outcome achievement is not the measure of compliance" with a permanency plan. *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *6 (Tenn. Ct. App. July 28, 2017) (quoting *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *11 (Tenn. Ct. App. Mar. 2, 2009)).

In the present case, after the children entered DCS custody, two Family Permanency Plans were ratified by the trial court. The original plan was ratified on June 8, 2017. A revised plan was ratified on November 7, 2018. Mother's requirements in the revised plan were the same as in the original. Both plans required Mother to complete several tasks, including: attend the children's educational meetings and medical appointments; consistently visit the children; maintain and reside in housing for at least six months and provide proof of such housing to DCS; maintain contact with DCS and notify it of any changes of circumstances including employment, address, and contact information; not incur any additional criminal charges; obtain counseling for her parenting and domestic violence concerns; and provide a transportation plan to DCS. The children entered DCS custody due to Mother failing to provide adequate care and supervision. We find that Mother's requirements under the permanency plans are reasonably related to remedying those conditions. *See In re Valentine*, 79 S.W.3d at 547.

Despite the efforts made by DCS to assist Mother with the permanency plans, Mother made efforts to satisfy only a few minor requirements. At one point, Mother provided proof that she had a valid driver's license, but her license was revoked shortly thereafter. Additionally, FSW Smith testified that Mother did provide proof of housing, but she clarified that Mother did not actually reside in that home. Mother also completed a psychological assessment, but she did not complete the parenting portion of the assessment. Aside from these few examples of minor progress, Mother failed to complete the vast majority of her requirements under the permanency plans.

FSW Smith and FSW Jennings testified at length on Mother's lack of compliance with the permanency plans. FSW Smith testified that Mother never participated in family counseling, never provided proof of a legal income, never resided in a single home for at least six consecutive months, did not attend educational meetings for Kassiah, and did not complete parenting classes. FSW Smith and FSW Jennings each testified that Mother has been confrontational towards DCS and that she has not maintained regular contact to update DCS on changes to her employment status or living situation. Additionally, Mother missed several visits with the children throughout their time in DCS custody. FSW Jennings stated that on one occasion when Mother missed a visit, she lied to the children by telling them that she was not informed of the visit. In actuality, Mother helped arrange the visit. When the children learned that Mother lied to them, they became understandably upset. In regards to the requirement for Mother to abstain from incurring additional criminal charges, as we have previously discussed, Mother incurred multiple charges in

September and October 2018.

The vast majority of Mother's requirements under the permanency plans were directly related to remedying the issues that led to the children being removed from Mother's custody. Thus, we cannot say that her noncompliance with the permanency plans consisted of "trivial, minor, or technical deviations" from the requirements. *See In re M.J.B.*, 140 S.W.3d at 656. Instead, we find that Mother's noncompliance was substantial. *See id.* Therefore, we affirm the trial court's finding that there was clear and convincing evidence to terminate Mother's parental rights under Tennessee Code Annotated section 36-1-113(g)(2) for her substantial noncompliance with the permanency plans.

### 5. Failure to Manifest an Ability and Willingness to Parent

Under Tennessee Code Annotated section 36-1-113(g)(14), a court may find a ground for termination of parental rights if two elements are found by clear and convincing evidence. For the first element, the petitioner must prove that "the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *In re Neveah M.*, 614 S.W.3d at 674. Second, the petitioner must prove that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.* Added to section 36-1-113(g) in July 2016, this ground for termination is relatively new. *See In re Rahjada W.*, 2020 WL 2893434, at *10. Previously, a split of authority developed among this Court regarding the first element of this ground. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9-10 (Tenn. Ct. App. Oct. 29, 2018) (describing the differing approaches).

The differing approaches to the first element of section 36-1-113(g)(14) were exemplified in *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044 (Tenn. Ct. App. May 31, 2018), and *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018). In *In re Ayden S.*, this Court held that the petitioner must prove "that the parent failed to manifest an ability *and* willingness to personally assume legal and physical custody or financial responsibility of the child." 2018 WL 2447044, at *7. In contrast, *In re Amynn K.* stated that the petitioner must prove that the parent failed to manifest an ability *or* willingness to assume custody or financial responsibility of the child. 2018 WL 3058280 at *14. "Stated differently, 'the parent must have "manifest[ed], by act or omission, an ability and willingness"'" to assume custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 675 (quoting *In re Amynn K.*, 2447044, at *13). Recently, the Tennessee Supreme Court resolved this split of authority.

In *In re Neveah M.*, the Tennessee Supreme Court determined the proper interpretation of the first prong of section 36-1-113(g)(14). 614 S.W.3d at 674-75. After determining that the first prong of the section is ambiguous, the Court concluded that the

first prong "places a conjunctive obligation on a parent or guardian to manifest *both* an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 676-77 (emphasis added). As a result, the Court adopted the approach stated in *In re Amynn K.*, 2018 WL 3058280, at *14, and expressly overruled *In re Ayden S.*, 2018 WL 2447044, at *7. *Id.* at 677. Therefore, it is now evident that in order to satisfy the first prong of section 36-1-113(g)(14), the petitioner must "prove[] by clear and convincing proof that a parent or guardian has failed to manifest either [an] ability or willingness" to parent the child. *In re Neveah M.*, 614 S.W.3d at 677.

In the present case, DCS proved by clear and convincing evidence that Mother failed to express both an ability and a willingness to assume custody or financial responsibility of the children. A parent's ability to assume custody or financial responsibility is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Ayden S.*, 2018 WL 2447044, at *7). Again, Mother has continuously lived a volatile and chaotic lifestyle since the children entered DCS custody. She has failed to consistently visit the children. She has resided at several different locations in multiple states, including Tennessee, Georgia, and Florida. At various points during her nomadic escapades she has been forced to reside at domestic violence and homeless shelters. Mother resided in these shelters, in part, to escape from the domestic violence incidents that continued to occur in her home. Based on her lifestyle, it is clear that Mother is not able to assume custody or responsibility of the children.

Criminal activity and failure to support a child "raise doubt as to [a parent's] actual willingness to assume custody or financial responsibility for the [c]hild." *See In re Amynn K.*, 2018 WL 3058280, at *15. At various points in this case, Mother incurred several new criminal charges that led to multiple stints of incarceration. Additionally, she has failed to provide support for the children. She paid token and infrequent child support, and decided to forgo attending the children's educational meetings. Rather than prioritizing the children or establishing a suitable home, at times, Mother chose to travel to luxurious destinations, such as Las Vegas and Jamaica. Accordingly, it is evident that Mother failed to manifest either an ability or willingness to assume custody or financial responsibility of the children. As a result, DCS satisfied prong one of section 36-1-113(g)(14) by clear and convincing evidence. *See In re Neveah M.*, 614 S.W.3d at 677.

Under the second prong of section 36-1-113(g)(14), we further find that returning the children to Mother's legal or physical custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Mother has not shown an ability to provide essential necessities for the children, such as a suitable home, proper nutrition, or consistent support. In contrast, Kaylene, Jasonna, and Kassiah were doing well in their foster homes. Kaylene and Jasonna have expressed a desire to be adopted by their foster family, and Kassiah is receiving sufficient care in her long-term foster home. Kaylene and Jasonna's therapist, as stated in her letter to the court, indicated that they would benefit by

- 23 -

remaining in the care of their foster family. Based on the record as a whole, we agree and find that returning them to Mother's custody would likely cause the children substantial physical or psychological harm.

In sum, DCS has established both prongs of Tennessee Code Annotated section 36-1-113(g)(14) by clear and convincing evidence. Therefore, we affirm the trial court's decision to terminate Mother's parental rights for her failure to manifest an ability or willingness to assume custody or financial responsibility of the children.

### D. Best Interest of the Children

Having found that DCS has established at least one ground for termination under Tennessee Code Annotated section 36-1-113(g), we will now determine whether terminating Mother's parental rights is in the best interest of the children.

In determining whether terminating a parent or guardian's parental rights is in the best interest of a child, courts are instructed to consider the factors listed in Tennessee Code Annotated section 36-1-113(i). *See also In re Neveah M.*, 614 S.W.3d at 678-79. Section 36-1-113(i) lists nine factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

- 24 -

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "The child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Neveah M.*, 614 S.W.3d at 679 (alteration in original) (quoting *In re Audrey S.*, 182 S.W.3d at 878). Because "[t]he unique facts and circumstances of each case dictate the weight and relevance that a court should afford each statutory factor[,] . . . [t]he best-interests analysis remains a factually intensive undertaking." *Id.* (citing *In re Carrington H.*, 483 S.W.3d at 523). Although courts must consider each statutory factor, *id.*, a finding on each factor is not required. *See In re Matthew T.*, 2016 WL 1621076, at *16 (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

Application of the best interest factors in this case weighs in favor of terminating Mother's parental rights. Mother's continued instability and inability to care for the children display a failure to change her circumstances that would make it safe for the children to return to her care. *See* Tenn. Code Ann. § 36-1-113(i)(1). Mother failed to make any lasting adjustment despite the repeated assistance that was offered by DCS workers such as FSW Smith and FSW Jennings. *See id.* § 36-1-113(i)(2). Although Mother did share some visits with the children, she failed to attend visits on a regular basis, causing a further deterioration of the minimal relationships between Mother and the children. *See id.* § 36-1-113(i)(3)-(4). Mother continues to frequently change residences that have produced continued acts of domestic violence, abuse, and criminal activity. *See id.* § 36-1-113(i)(7). FSW Jones testified that Mother's two youngest children reported instances of sexual abuse by Mother and her paramours. *See id.* § 36-1-113(i)(6). In contrast, Kaylene, Jasonna, and Kassiah are reportedly doing exceptionally well in their respective foster homes. These children have grown attached to their new homes and foster parents, who provide safe and stable care for the children. In fact, Kaylene and Jasonna wish to be adopted by their foster family, and the family has also expressed a desire to adopt them. Removing the children from these stable and safe homes would likely cause them unnecessary emotional and psychological harm. *See id.* § 36-1-113(i)(5). Mother's

repeated outbursts towards DCS, her apathetic attitude towards the children's wellbeing, and her encouraging the children to lie about their foster homes demonstrate a mental and emotional state of mind that prevents her from properly caring for the children. *See id.* § 36-1-113(i)(8). Further, Mother has paid token and infrequent child support since the children entered DCS custody. *See id.* § 36-1-113(i)(9).

In sum, the factors listed in Tennessee Code Annotated section 36-1-113(i) all indicate by clear and convincing evidence that it is in the best interest of the children to terminate Mother's parental rights. Having found that least one ground for termination has been established and that it is in the best interest of the children, we affirm the trial court's decision to terminate Mother's parental rights.

## V.    CONCLUSION

For the reasons stated herein, the decision of the trial court is affirmed in part, vacated in part, and remanded. Costs of this appeal are taxed to appellant, Katina R., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE